Good morning, everyone. We're here today for oral arguments. We're going to begin with appeal number 24-1026, Daniel Christensen et al. v. William Weiss et al. And Mr. Aiken, we'll begin with you. May it please the court, I am Michael Aiken, and I represent the estate of Donna Christensen, buying through her next of kin, Daniel Christensen, related to several constitutional violations that resulted in Donna Christensen suffering and ultimately her suicide at the Vilas County jail in northern Wisconsin. The district court in this case dismissed the 1983 constitutional claims on a motion for summary judgment and also dismissed the supplementary state law claims without prejudice. This appeal presents a straightforward series of procedural issues and a more complex set of issues relating to the substantive constitutional violations. The straightforward issue is the district court abused its discretion related to a surprise and premature summary judgment deadline and refused to allow additional time for discovery. But didn't the parties agree to a two- or three-week stipulated new deadline and requested that of the judge? I believe that when the status conference was held after the initial scheduling order was struck, counsel was wrong-footed at that point, and that was indicated in the docket entry that they were not prepared to file a motion for summary judgment. There was a prior stipulation to extend the deadline as the parties were working together and knew that the record was not ready for summary judgment at that point. Mr. Aiken, we do have quite a bit of briefing with regard to the procedural issues. I'd like to focus in, and you can certainly return to those if you wish, but I'd like to focus in on the claim against Officer Wilmot. Is the theory a straightforward one of excessive force, or is the theory what the district judge called the roundabout theory, the series of elements that would together aggregate to your thoughts with regard to a theory of prosecution? It is a straightforward use of unreasonable force against Officer Wilmot, and that use of force was captured on video, and it's our contention that Ms. Christensen's side of the story that's shown on video is not blatantly contradicted, so it would fall under the Supreme Court's decision in Scott. And there's multiple evidence of maliciousness to satisfy deliberate indifference, starting with the fact that the officer observed her susceptibility to being in solitary conditions, how that affected, you know, revealing an obvious mental illness, and he still continued to punish her for the maximum allowed punishment of what amounted to 30 additional days in solitary confinement. So let's examine that second element. As I understand the roundabout theory, first, the allegations Mr. Wilmot used excessive force to thrust Donna into him. Second, he violated her due process rights by disciplining her with this confinement, which you mentioned, and then third, his discipline combined with mental illness ultimately led to the suicide. On the second element, the violation of the due process rights by disciplining her, how is that a violation of the due process rights? How is placing her in that 10 days of segregation, how does that result in a due process violation, that second link of the chain? Yes, so the due process violation relates to the fact that Officer Wilmot was not only the officer that was involved in the use of force, he also was the supervising officer that was supposed to look at the use of force and determine if that was reasonable. So he signed off essentially complying that he himself complied with the obligations. He did that because he testified he thought that that would mean that his conduct would not be further subject to any further review. And he essentially tricked Donna Christensen into waiving her due process rights by promising her that he would put her back near people and, you know, even though she expressed 10 days was a long time to be alone, didn't tell her that she was going to be on the hook for 30 days. So it's the lack, it's the signing off on his own conduct and then also essentially tricking Ms. Christensen into waiving her due process rights that we believe is a due process violation. And just so I get the clarity on the theory, there has what we've called this roundabout theory with the three elements. The other theory would be just a straightforward allegation of intentional use of excessive force. That's also the first of the three steps in the roundabout theory. Is that right? Yes. I mean, these things, what makes this case complicated is the different violations sort of are intermingled. But I think combined, how you look at them, they show that the action by Officer Wilmot was done with malicious intent rather than a good faith effort to maintain order in the jail. And it was my intention to spend more time on the substantive constitutional violation issues rather than the procedural issues because those are set forth in the brief. And so those issues are whether Donna Christensen was denied a right to medical evaluation and treatment for her obvious signs of mental illness, whether there was reasonable precautions taken based on a substantial awareness to the risk of suicide, and then as you mentioned, the unreasonable use of force. In terms of the medical evaluation and treatment, we must show a serious medical need and deliberate indifference. And a response to the serious medical need or lack thereof can constitute deliberate indifference. And that can be shown if there's no medical care provided or if there is some medical care that evidenced a complete absence of medical judgment. What evidence do we have that they are in? Linda Thayer? Yes, Nurse Thayer. Okay. What do we have of deliberate indifference there? As far as deliberate indifference with Nurse Thayer, the record is somewhat incomplete on that fact because of the summary judgment deadline that was imposed by the district court. We didn't have the opportunity to fully explore how she may have been involved in terms of setting policies that were unconstitutional. And as far as proving her deliberate indifference, if she's part of this system and would have been someone who was part of the planning of this system to say that it's adequate, where you're having someone who's unqualified and herself testified she could only give support and encouragement as opposed to any medical care, those issues still need to be developed. And that's one reason that the procedural issues in this case do bleed forward to the substantive issues in terms of the constitutional violations. We still think, though, based on the evidence where the court can move this case forward as to the primary defendants. Nurse Thayer and there's also a physician's assistant, Scott. Gregory Scott? Yes. He's another person who at this point with the record being what it is due to the procedural issues, we don't have a full understanding of how he was involved. And we know that from the record, he did not see Donna records, but yet his signature was used on the form that released her from Suicide Watch. So they were using him in order to do what they should have done, which is to have a medical evaluation of Ms. Christensen when she's showing, professing a threat to commit suicide and saying that it's because she's hearing constant voices telling her to kill herself for weeks leading up to her placement in the jail. Well, let's turn then to focus on Zimba, okay? The mental health professional. I do take your point that it seems that someone who's presenting as Ms. Christensen did could use more than support and encouragement. That's the quote. And I thought that came from Zimba, not Thayer. Does the record tell us whether this is some sort of policy of these ACH defendants and what's routine when folks are coming into the jail who are withdrawing from their substance abuse? What does the record establish? And I understand that you're saying you weren't able to finish developing some things because of deadlines, but what did you have in there? Yes, in terms of what we have in the record, we know that Kayla's Zimba testified that she could provide support and encouragement and couldn't even refer out for any medical evaluation or treatment because it wasn't allowed under her understanding of the law. I think a reasonable inference can be made that she must have gotten that understanding from her training from ACH, and that was their policy, that they're not going to allow her as a qualified mental health professional, regardless, to refer someone for medical evaluation or treatment until they get out of the jail. So we think that that is an important part of the record in that regard. And by that, because to me it was not clear from the record, was she talking about refer out for medical evaluation and treatment of the withdrawal, the substance abuse issues, or specifically the mental health issues? I believe that that was related to the obvious signs of mental illness. In terms of withdrawal, we know that when Donna Christensen turned herself into the jail because she was out on parole, she was withdrawing from drugs, and an officer noted that she was having severe withdrawal symptoms and said she should be seen by a nurse. No nurse ever saw her for that, and she was put into essentially what amounted to solitary conditions for COVID precautions. The Wisconsin law and the jail policy says you've got to have a medical evaluation within the first 30 days, and that didn't even happen in this case. Was she being held out, I guess, by ACH as a clinical social worker? She was held out by ACH as someone who was properly qualified to be a mental health professional in the jail. However, even according to the jail's own job description, it required someone who was fully licensed. And that's why I'm taking you back to my question. I understand what the policy is. I need to know whether or not she was being held out as a licensed social worker to be in compliance with that policy. I believe she was being held out by ACH to be compliant with that policy. However, it's worth noting at the time that she was working toward her licensure, the only way you can do that is if you're having supervision from someone who actually is licensed and is trained. And in this case, there's no evidence at all in the record that she was ever trained, and there's no evidence to suggest she was ever actually supervised. The person, Melissa Caldwell, who's not a part of this case because we weren't allowed to add her due to the procedural issues with the summary judgment deadline, Kayla Ziemba testified she was never even at the jail. She was never present for any of her interactions. And to me, the fact that Kayla Ziemba didn't as much as consult her supervising person in a case like this speaks volumes in terms of what that relationship actually was. And the district court just assumed that that supervision was present, and there's no evidence that that actually occurred in the record. Thank you. Mr. Aiken, let me contrast a statement Judge Peterson says on page two. Plaintiffs concede that they can't prevail in showing that any of the defendants were aware of a substantial risk that Christensen would commit suicide. But then the argument, obviously, that you end with in your brief is a reasonable jury could find defendants were deliberately indifferent to risk of suicide. Is your position that the district court incorrectly apprehended your theory? Yes, Judge, it is our contention. I don't know where the judge in the district court made that conclusion. But I think what it was is there's a difference when you've got someone like Donna Christensen who's had a history of suicide attempts, threatened suicide, a vulnerability to solitary conditions, and obvious signs of mental illness. You don't need to have immediate signs like you would for someone who's a sane person and having momentary signs of suicide to be able to stop them. When you take someone and you put them in that position with everything that Donna Christensen had, you take no reasonable precautions whatsoever, and you give her no medical evaluation. Our contention is that that substantial risk of suicide is still existing. She essentially went from suicide watch, the frying pan, right into the fryer, and now she got put in a part of the jail where she was completely isolated for the last 10 days of her life and nothing was done. And so that's the difference where I think the district court may have misapprehended that. Would you like to reserve the remainder of your time? I would. Thank you very much. Thank you, Mr. Aiken. Mr. Knott, we'll move to you. May it please the court. Good morning. I'm Doug Knott. I represent the defendants' appellees, Linda Thayer, Greg Scott, and Kayla Ziemba, as well as their employer, Advanced Correctional Health Care. We're here to ask that the court affirm dismissal of the claims against those defendants. Mr. Knott, do you mind if we start with Kayla Ziemba and whether or not she was being held out by Advanced Correctional Health as a clinical social worker able to provide this mental health diagnostic testing or what have you? I don't know what policy Mr. Aiken was referring to. She is a qualified mental health provider, which is a defined term by a national organization called the National Commission on Correctional Health Care, and they have standards on mental health, and it defines in there what a qualified mental health provider is. It's in the record at docket 37-5 at page 2, and in there it lists a series of professionals that can qualify as qualified mental health providers. Among them is psychiatric social worker, and then there's a that says others who by experience or training are qualified to perform risk assessments, suicide risk assessments. She was going a little further than a risk assessment. I'm sorry? Was she providing care beyond that of a risk assessment? I think an advanced social worker would be able to do that as well. She was. Under Wisconsin law, and it's the administrative code MPSW at 6.02 and 6.04, a advanced practice social worker is permitted to intervene in difficult situations. Under 6.04, a licensed clinical social worker is permitted to diagnose, treat, and a whole list of other activities that they can engage in, clearly providing therapy in a jail. And under Wisconsin law, Ms. Ziemba was not only acting under her certificate as an advanced practice master level social worker, but also was in training to become a licensed clinical social worker. Going back to my question, I believe that ACH accepted below that Ms. Ziemba in this instance was providing licensed clinical social work services. And so I'm trying to tie up if she could do the risk assessments, but she was doing more here, and the allegation is deliberate indifference. What would have qualified her, I guess, under that training or supervision that I can go to in the record to demonstrate that she could, I guess, exercise that function? I think she was acting, she certainly was qualified under, as the court observed, she was qualified under Wisconsin law to practice licensed clinical social work. The plaintiffs have never articulated a standard. But see, that's where I think I disagree with that finding. When we look at Wisconsin law 457.04, one of the prohibited practices is engaging in licensed social work and not being supervised by a licensed social worker. So I'm looking for the tie-up. And she was supervised. We proposed as fact at Record 74, paragraph 111, that she was supervised by a doctorate level clinical psychologist, and that was not disputed. Would Dr. Caldwell, though, qualify under this statute? Yes, and that's explained in Ziemba's affidavit that was submitted, that's Record 40. And ultimately, she explains, Ms. Ziemba does in her declaration, that her hours that she put in at the Vilas County Jail were submitted to the state for her approval to become a licensed clinical social worker. I guess where the disconnect is, is that there's nothing on the record that shows that Dr. Caldwell could stand in the shoes of a licensed clinical social worker under the prohibited acts. Where you're talking are more so focused on what would have eventually qualified Ms. Ziemba as a licensed clinical social worker. What I'm wanting to direct us to is where in Wisconsin law could she act as a clinical social worker while being supervised by a psychologist? I believe that, if we get into the weeds in the exact description of how the supervision occurs, I believe that's 457.08 sub 4, and then the paragraphs below there explain how that supervision occurs. And a doctorate level clinical psychologist is approved, and ultimately was approved in Ms. Ziemba's case as a supervisor. But to go back to your first question, I think that the question is whether Ms. Ziemba was, well one is whether she was acting within the scope of her authority, which given the information that was provided to her, she certainly was. Whether it required a clinical intervention or just the assessment of an advanced practice social worker. She performed the initial risk assessments. She saw Donna Christensen four times in two weeks. And after she performed the initial risk assessment, it wasn't support and some kind of fuzzy help. It was they worked on self-worth, but most importantly she worked with her and counseled her on drug recovery. It's not clear from the record, but you could explain who made the determination that she could come off of, Donna could come off of Suicide Watch. Ms. Ziemba did on the basis of her assessment on October 8th. And Mr. Aiken's reference to PA Scott is off the mark. Mr. Scott did not need to do a medical evaluation. He was just acknowledging that he's aware that she came off of the watch. We need to go back to Ms. Ziemba. Let's assume she's qualified. She had in her arsenal knowledge of Ms. Christensen's past mental health issues and suicidality because she had prior knowledge of Ms. Christensen. She had previous experience with her for months before when she had been at the jail. So when you marry that prior knowledge with what Ms. Ziemba is telling her in that first encounter about her hallucinations and thoughts of self-harm, and you also marry that with the fact that she's withdrawing from drugs, what are we to make of that, that within a minute's worth of assessment she takes her Suicide Watch in one day? Why is that not a reasonable thing that Mr. Aiken is asking us to look at? It's more than that. First of all, there was a suicide assessment mechanism. There's a questionnaire called an ASQ that was used, which is within her professional judgment. But beyond that, on October 8th, in her interview, Ms. Ziemba learned that Donna had self-insight, that what she had been going through and what made her, she said, spaz out was a concern about withdrawal. And Ms. Ziemba was assured on the 8th that she was past that. But she came back on the 12th to make sure of that, and did a long telemedicine, because it was COVID, did a long interview, and came back again on the 20th to make sure that she was doing well. So the most important thing that she did as a social worker was implement a safety plan. That's the plan that was put in place, was to keep close watch on her, make sure she was articulate, make sure she was asking for her needs, and she did. She ultimately... I'll be honest, one thing that concerns me is when Ms. Ziemba first sees her and tells her, I'm going to put you on suicide watch, Ms. Christensen's reaction is, I'm not going to talk to you then. As in, I'm not happy with this decision to be on suicide watch. So then Ms. Ziemba shows up the next day, and all of a sudden, Ms. Christensen is reporting, I'm cured, I'm fine. So when the court is drawing inferences from the record about what happened and the quality or the depth or scope of Ms. Ziemba's care, one issue there is whether Ms. Christensen determined she had to say whatever she needed to say when Ms. Ziemba shows up the next day to make sure she gets off suicide watch. And if that involves reporting that I'm no longer feeling the way I was feeling the day before when you told me you were putting me on suicide watch, that becomes an inference that it could be reasonable for a fact finder to draw. It's a very troubling circumstance where the mental health provider is trying to assess whether the client is, in fact, misleading them to get off a suicide watch so that they could do that. On the other hand, she also knows that it's very uncomfortable, and as this court has acknowledged, it's very uncomfortable to remain on suicide watch, and so she's trying to balance that. But I think the important thing is to recognize that from her last statement that she had a mental health concern. The next day, she had insight, and my client did know her from when she was a child. She had worked with her in the child welfare system, and there was no activity, there was no suggestion in all of those contacts from October 8th to October 26th when she committed suicide. There's not a single fact that suggests that she was delusional, needed care, that she was asking for help. There's not a single fact to that effect. And that's why it would not be a fair inference to suggest, particularly under the Eighth Amendment, that Ms. Ziemba should have inferred on the 8th that she would be eminently suicidal or that she would commit suicide 18 days in the future. Thank you very much, Mr. Knott. We'll now move Mr. Jones to you. Good morning. You may have pleased the court. I'm going to start, if I may, where you did, Judge Brennan, with the question about the claim against Sergeant Wilmot. That is, whether there are separate stand-alone claims, excessive force due process, or whether it's part of one larger theory. And I would say it's been both at times in this case. But to me, the answer is the same, whether they're considered as individual claims or wrapped up in one larger claim against Sergeant Wilmot. I think the record is clear on the excessive force component, principally pointing the court to the video recording, as Judge Peterson found, that that speaks for itself. And it points to an absence of excessive force on Sergeant Wilmot's part. And considering that with the factors that the cases say are relevant, he had a good faith reason to use the force he used to pull the mattress from the cell, to hold Ms. Christensen against her bunk only briefly. He had a good faith reason to do both based on what was occurring in the cell. The amount of force he used was reasonable in relation to what was occurring. If we, having reviewed the video, come to a different conclusion about whether it conclusively shows that Ms. Wilmot shoved him in a way that would make his return force proportionate, do we then have a jury question? I think ultimately, the answer to those factors, that is whether he had a good faith basis to use the force, whether the amount of force was reasonable in relation to its purpose, whether he tempered the use of force, and whether there was injury or pain that was caused, stand independent of the question of whether Ms. Christensen pushed Sergeant Wilmot. So I think the answer is the same, even if the court has a question in its mind about what that video exactly shows. Because even if she hadn't intended to push him, there's still physical contact between the two of them. There's still the larger context of what she had been doing in the cell. So holding her briefly for less than 10 seconds against her bunk without using any additional force, I think under the circumstances was reasonable. And I don't think there's any evidence that it was done maliciously and sadistically for the purpose of causing harm. So I think the answer is the same, Your Honor. As to the due process claim or component, your Honor asked the question, why is there a due process constitutional violation from putting her in disciplinary segregation for 10 days? And I think the answer is that there isn't. I'll come back to that. But outside of those 10 days of disciplinary sanction, Ms. Christensen's- Is there an overlap between, because I think this is still during COVID, and so there's still the two week? Yes, there is an overlap. And that timeline is important because when she was on COVID quarantine or when she was in medical segregation because they were waiting for a test, and then when she was after she came off the discipline and was simply there based on her classification status, those are administrative decisions that the case law of says are not subject to due process concerns. For that 10 days, from October 6th to October 16th, eight of those days, she was still on a COVID quarantine. So her status really wasn't any different being on discipline, except that she had privileges removed. But the fact that she was in her cell for 23 hours each day, that would have been the same whether or not she had been on except for October 15th and October 16th. But can you address Mr. Aiken's point that not only were there those two days after the COVID, she's in these two extra days of the 10 day, but also according to Ms. Christensen, he tricked her or failed to mention to her that there'd be 20 extra days. So now we're talking 15th, 16th, up through the 26th, she's still in the same posture now, regardless of COVID. Can you address that? Because that's what his answer was to Judge Brennan about the due process concerns. That situation and then also signing off on his own discipline, those two things. So a couple of things, or I guess to sort of unpack that, for those last 10 days, when she was confined based on a classification status alone, the circumstances weren't the same. Yes, she was still in a cell for 23 hours a day, but she had all of her other privileges returned. She had access to mail, reading materials, television. She was able to have contact with family and friends both over the phone and via video means. So the circumstances weren't entirely the same. But the issue of Sergeant Wilmot tricking her or not, there's an audio recording of that conversation that's part of the record, record 59-32. Sergeant Wilmot, as plain as day, asked her, do you want to appeal it to the next shift or accept it? And Donna responded, I'll accept it, and then signed. This idea that Sergeant Wilmot tricked her... No, no, no, no. I'm aware of that part of the record. I'm aware that she chose not to appeal it to the next shift. I'm asking about her understanding that this was not just 10 days. It was actually 10 plus 20. Because I don't get that from that exchange. Well, in part, I would say, to accept Mr. Aiken's argument there is to accept that there's an affirmative duty on the part of the officer under the Constitution to explain all aspects of what the discipline might entail. And I'm not sure that the cases point to that. I'm sorry, I lost my... Except doesn't he kind of do the opposite? Because he says, when your COVID test comes back, I'll put you by people. And that's actually not going to happen because she's got 10 plus 20 days of isolation left? Well, in fact, that's exactly what happened. Because her COVID test came back on October 8th. And as a result, she was removed from medical segregation and put in the D block where there were other inmates. So she was taken from medical segregation where she was entirely by herself and put in a housing unit or pod where there were other inmates. That was still segregation though, because she was in her cell 23 hours a day, correct? Yes, but that's not inconsistent with saying you're going to have 10 days of discipline, which she would have understood. And there was even part of that conversation that made it clear she understood that that means you're going to be in segregation for those 10 days in your cell 23 hours a day. But she was in a cell block where when she was out of her cell, she was able to converse and communicate and interact with other inmates in the cell. And there were other inmates in the cell, in the cell block, and there were other inmates in the cell block. Thank you, Mr. Jones. Mr. Aiken, we'll move back to you now. Two minutes for rebuttal. Thank you. This case presents a very important issue related to mental health, which is becoming an epidemic in our country. Jails are now the biggest provider of mental health services, particularly to those who are in the most vulnerable segments of our population. Donna Christensen was part of one of the most marginalized groups in our country. She's a Lac du Flambeau Indian, where drug use is rampant and there's a lack of access to traditional medical care. In fact, 45 percent of the inmates in Biola's County Jail are from her tribe. Deliberate indifference, the standard is evolving and it's about decency and human decency. And paying lip service to the right to provide medical care for serious mental illness, support and encouragement, instead of medical evaluation and treatment, a signature of a doctor instead of actually having a doctor evaluate the person, is not conforming with the standard of human being, despite that she's from a marginalized group. And society has an obligation to do better. And the Constitution provides that guarantee for people like her. Ms. Christensen has a right in this factual record to move forward with her 1983 claims. This court should address those issues to move this litigation forward to the extent the record allows it. The procedural aspect of this case also needs to be put on its tracks. So there's two good reasons for this court to reverse the summary judgment from the district court, remand this case for full discovery, and allow the full evidentiary record to be presented to the jury to see what they think of her treatment at the Biola's County Jail and whether it conforms with the standards. And also, we would request that the state law supplementary claims that were dismissed without prejudice also be reinstated. Thank you.